IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CLIFTON EVANS,

                        Plaintiff,                    OPINION & ORDER

  v.

                                                          12-cv-888-jdp

CAROLYN COLVIN,
Commissioner of Social Security,

                        Defendant.

---

      Plaintiff Clifton Evans seeks judicial review of a final decision of the Commissioner of Social Security finding him not disabled within the meaning of the Social Security Act. Plaintiff contends, principally, that remand is warranted because the Administrative Law Judge (ALJ): (1) wrongly discredited the opinions of plaintiff's treating psychiatrist, psychotherapist, and primary care provider; and (2) wrongly assessed the credibility of plaintiff's testimony regarding his impairments. According to plaintiff, the ALJ disregarded the record evidence in favor of the ALJ's lay appraisal of plaintiff's mental health and his abilities. The court agrees and will remand the case to the Commissioner for further proceedings.

## BACKGROUND

### A. Procedural Background

      Plaintiff, born 1968, has a high school education and formerly worked as a machinist, inspector, supervisor and project engineer in a machine shop. Plaintiff sought Social Security disability insurance benefits alleging that he had been disabled since December 2008, when he suffered a brain aneurysm. The aneurysm was successfully repaired through surgery, but it has lingering effects, including recurring major depression. Prior to the aneurysm, plaintiff suffered

from trichotillomania,[1] which worsened after the aneurysm and the subsequent depression. Plaintiff is also hypertensive, diabetic, and severely overweight, conditions which apparently pre-date the aneurysm.

Plaintiff applied for Social Security disability benefits; the application was denied. After a hearing, ALJ William Zellman denied plaintiff's application on the grounds that plaintiff had the residual functional capacity to perform certain light-duty jobs despite his impairments, such as housekeeper/cleaner and small parts assembler. R. 32-44.[2] Plaintiff's request for review was denied by the Appeals Council, making ALJ Zellman's decision the final determination of the Commissioner. On December 6, 2012, plaintiff timely sought judicial review in this court pursuant to 42 U.S.C. § 405(g).

**B. Relevant Medical Evidence**

Plaintiff, 40 at the time, sought emergency room treatment for severe neck and head pain on December 7, 2008. A CT scan showed a cerebral aneurysm, and plaintiff underwent brain surgery to repair it. R. 249, 304-07. Post-operative CT scans showed some additional cerebral hemorrhage and cortical contusions after surgery; these conditions stabilized in the following weeks. Plaintiff was released from the hospital on December 20, 2008. R. 249.

To provide a framework for the summary of the medial evidence that follows, the pertinent period for purposes of this case is from plaintiff's release from the hospital in December 2008 to the hearing in January 2011. During that time, plaintiff was treated by Dr.

---

[1] Trichotillomania is an irresistible urge to pull out hair from the scalp, eye brows or other areas of the body. For some, the urge to pull their hair is overwhelming and can be accompanied by considerable distress. *Trichotillomania (hair-pulling disorder)*, Mayo Clinic, http://www.mayoclinic.com/health/tricotillomania/DS00895 (last visited June 12, 2014).

[2] Record citations are to the Administrative Record, Dkt. 7.

Heffez (neurologist), Dr. Saxena (neurologist), Dr. Riordon (primary care physician), Dr. Raster (psychiatrist), and Ms. Gunville (therapist). Dr. Riordan, Dr. Raster, and Ms. Gunville provided reports of plaintiff's condition for his application for disability benefits, and the ALJ's consideration of those three reports is particularly significant to the court's decision. In 2010, plaintiff's medical records were reviewed by three state agency non-examining reviewers, Dr. Khorshidi, a physician, and pyschologists Dr. Pape and Dr. Rattan.

After his release from the hospital, plaintiff had follow-up care with Dr. Heffez, a neurologist, for approximately the first half of 2009. In the first months after the aneurysm, plaintiff suffered from headaches, double vision, light sensitivity, fatigue, weakness in his extremities, and recurrence of his trichotillomania. R. 256. Dr. Heffez observed that plaintiff had trouble tracking his left eye gaze. Some of plaintiff's symptoms abated by the middle of 2009, but he continued to suffer from insomnia, fatigue, short-term memory loss and a speech impairment. By mid-2009, plaintiff was also suffering from depression. His EEG was abnormal, prompting concern for seizures. R. 265.

Plaintiff was referred to Dr. Saxena for further neurological evaluation in July 2009. By that time, plaintiff reported memory problems, intermittent blurred vision, lightheadedness, tremors, headaches and insomnia. R. 289. Dr. Saxena's diagnostic impression was that:

> Mr. Evans' neurological examination is felt to be essentially nonfocal and normal. His symptoms are felt to be at least in part in relation to anxiety and depression. Some of it may be in relation to "brain injury."

R. 291. Dr. Saxena recommended follow up with plaintiff's personal physician for blood pressure regulation and a psychiatric consultation. *Id*. Plaintiff saw Dr. Saxena again in November 2009, when Dr. Saxena again noted plaintiff's memory problems but attributed most of his symptoms to depression and anxiety.

3

Plaintiff's primary care physician, Dr. Riordan, saw plaintiff regularly in 2009. In November 2009, Dr. Riordan noted plaintiff's memory problems and adjusted his blood pressure medication.

Plaintiff underwent a psychiatric evaluation in January 2010 by Dr. Raster, who noted symptoms including depressed mood; anhedonia; anergia; psychomotor retardation; insomnia; reduced concentration; periods of hopelessness; and intermittent passive suicidal ideation R. 404. Dr. Raster also observed mild psychomotor retardation and slight stuttering. His diagnostic impressions included "Major depressive disorder, recurrent, moderate in severity. Trichotillomania," and a GAF of 50. R. 405-06. Dr. Raster recommended medication and therapy. *Id*. Later in January, plaintiff was evaluated by Ms. Gunville, a therapist, who also indicated that plaintiff suffered from a recurring major depressive disorder of moderate severity. R. 420.

Plaintiff applied for disability benefits in January 2010, and a Social Security Administration reviewer recommended denial on March 16, 2010. Shortly after, two state agency non-examining reviewers evaluated plaintiff's file. Non-examining reviewer Dr. Khorshidi completed a Physical Residual Functional Capacity (RFC) indicating that plaintiff could perform "medium" work. R. 432-39. State agency non-examining reviewer Deborah Pape, PhD, completed a Psychiatric Review Technique form. R. 440-53. Dr. Pape noted a depressive syndrome with psychomotor retardation, decreased energy, feelings of guilt or worthlessness and difficulty concentrating/thinking. R. 443. Dr. Pape noted mild limitations in activities of daily living; mild difficulties in maintaining social functioning; moderate limitations in concentration, persistence and pace; and no episodes of decompensation of extended duration. R. 450. Dr. Pape also filled out a Mental RFC form. R. 454-57. Dr. Pape opined that plaintiff had moderate limitations with: dealing with detailed instructions; maintaining attention and concentration for

4

extended periods; performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances; completing a normal workday and workweek or performing at a consistent pace without unreasonable breaks; and responding appropriately to changes in the work setting. R. 454-55. Dr. Pape opined that the individual with these limitations could do unskilled work. R. 456.

Plaintiff's treating psychiatrist, Dr. Raster, completed a mental impairment questionnaire on May 4, 2010. Dr. Raster again reported that plaintiff suffered from a recurring major depressive disorder, noting a number of symptoms. R. 459. Dr. Raster reported marked limitations of daily activities; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence and pace; and no episodes of decompensation of extended duration. R. 460. Dr. Raster reported a residual disease/process that would likely cause the individual to decompensate with even a minimal increase in mental demands. R. 461. Dr. Raster assessed that plaintiff would likely be absent from the workplace more than four days per month. R. 461. Regarding mental RFC, Dr. Raster reported marked limitations in the following areas: dealing with detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, being punctual; completing a normal workday or workweek, performing at a consistent pace without unreasonable breaks; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. R. 461-62. Dr. Raster reported moderate limitations in the following areas: dealing with work-procedures and simple instructions; working in coordination with others; accepting criticism and responding appropriately to supervisors; dealing with co-workers; maintaining socially appropriate behavior; taking appropriate precautions from hazards; and traveling in unfamiliar places. *Id.*

Treating psychotherapist Gunville completed a mental impairment questionnaire consistent with the assessment completed by Dr. Raster. R. 464-69. Ms. Gunville specifically noted that plaintiff had shown only minimal improvement with treatment and that he showed a loss of concentration/focus and negative thinking. R. 464.

In August 2011, State agency non-examining reviewer Dr. Rattan, PhD completed a Psychiatric Review Technique form indicating that plaintiff suffered from a section 12.04 affective disorder of depressive syndrome with psychomotor retardation, decreased energy, feelings of guilt or worthlessness and difficulty concentrating/thinking. R. 501. Dr. Rattan also reported a section 12.06 anxiety disorder with recurrent obsessions or compulsions that are a source of marked distress. R. 503. Under the "B" criteria, Dr. Rattan reported moderate limitations of activities of daily living; moderate difficulties in maintaining social functioning and moderate difficulties with concentration, persistence and pace. R. 508. Dr. Rattan opined that he did not think the "C" listings criteria were met. R. 509. Dr. Rattan filled out a mental RFC form that was essentially the same as that filled out by the prior paper reviewer, Dr. Pape. R. 512-15.

In December 2010, Dr. Riordan completed a six-page Physical Residual Functional Capacity Questionnaire in which he detailed the symptoms and impairments from plaintiff's depression and anxiety. Dr. Riordan opined that plaintiff was not capable of performing sustained work activities in an ordinary work setting on a regular and continuing basis. R. 541.

C.  The Administrative Hearing and Decision

On January 5, 2011, the ALJ held a 50-minute hearing during which he took testimony from two witnesses, plaintiff and Malcolm Brodzinsky, an independent vocational expert. R. 50-

6

86. The documentary evidence, including plaintiff's medical records summarized above, was admitted without objection.

The ALJ asked plaintiff about his work history, his daily activities, and the reasons why he was unable to work. Plaintiff testified that his primary problem was that since the aneurysm he was "scatter brained," in that he could not concentrate, remember, or follow steps of even modest complexity. R. 60-62. He testified that he would become weak and lose his balance after sustained physical exertion, R. 66-67, and that he had difficulty in interacting with people, R. 72.

Mr. Brodzinsky testified that a person limited to unskilled work could not perform any of plaintiff's past relevant work. R. 78. The ALJ asked Mr. Brodzinsky a series of hypothetical questions involving a person with some of plaintiff's limitations. R. 79-83.

The ALJ issued a decision on January 21, 2011, concluding that plaintiff was not disabled. In short, the ALJ discounted the reports of plaintiff's treating providers, who had classified a number of plaintiff's impairments as "marked." The ALJ concluded instead that plaintiff had only "moderate" impairments based on plaintiff's reports of his daily activities and the ALJ's observation of plaintiff's demeanor at the hearing. Although plaintiff could not perform past relevant work, there were jobs available to him that only required sedentary work. For these reasons, the ALJ determined that plaintiff was not under a disability within the meaning of the Social Security Act.

**OPINION**

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). Rather, "the court must conduct a critical review of the evidence before affirming the [C]ommissioner's decision, and the decision cannot stand if it lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1079 (W.D. Wis. 2008) (internal citations omitted). To provide the necessary support for a decision to deny benefits, the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

After reviewing the record in this case, the court concludes that the ALJ erred in analyzing the opinions of the three treating sources, Dr. Raster, Ms. Gunville, and Dr. Riordan, and that the ALJ erred in assessing the credibility of plaintiff himself. These errors led to deficiencies in the vocational expert's testimony. Any one of these errors would warrant remand

**A. The ALJ improperly rejected the opinions of Dr. Raster, Ms. Gunville, and Dr. Riordan.**

The medical evidence includes the opinions of three treating providers, each of whom opined that plaintiff suffered from multiple "marked" limitations. Had these reports been credited, plaintiff would have qualified as having a listed affective disorder disability under

8

section 12.04 *and* a listed anxiety disorder disability under section 12.06. And even if plaintiff were not found to have a listed disability, each of the treating providers opined that plaintiff did not have the residual functional capacity to perform sustained work because of his major depressive disorder.

The ALJ was not required to give the opinions of the treating providers controlling weight under the treating source rule,[3] because those opinions are contradicted by the non-examining state agency reviewers. *See* SSR 96-2p (explaining that a treating source's opinion does not receive controlling weight "when two medical sources provide inconsistent medical opinions about the same issue"). But the principles in SSR 96-2p require that the opinions of the treating providers in this case be given deference, which the ALJ failed to do. Furthermore, the ALJ only gave summary explanations of his reasons for discounting the evidence from the treating providers. 20 C.F.R. § 404.1527(c) provides a list of factors that an ALJ must use as a framework with which to consider and weigh medical opinions. When an ALJ so systematically discounts the evidence of treating providers, he must ground his explanation for doing so in these factors. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The failure to explicitly discuss the § 1527(c) factors is itself a deficiency that warrants remand. *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (reversing an ALJ even when her "decision indicates that she considered opinion evidence in accordance with §§ 404.1527 and 416.927 [but] does not *explicitly address the checklist of factors* as applied to the medical opinion evidence") (emphasis added). In this case, the problem is not merely that the ALJ's decision is not fully explained; the ALJ's evaluation of the treating providers also has substantive deficiencies.

---

[3] The "treating source rule," derived from 20 C.F.R. § 404.1527(c)(2), "directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(c)(2)).

As for Dr. Raster, the ALJ concluded that:

> The undersigned declines to give Dr. Raster's opinion significant weight as his opinion is not supported by the objective medical findings in the claimant's case (e.g., findings on mental status examination) nor is it consistent with the claimant's admitted wide range of daily activities.

R. 41. The ALJ's conclusion is faulty in two respects. First, Dr. Raster's mental status examination notes, from January 5, 2010, do not contradict his opinion on the mental impairment questionnaire on May 4, 2010. The mental status examination notes show that Dr. Raster found plaintiff coherent and not disoriented. R. 405. But those notes did not address the symptoms of plaintiff's depression. The fact that plaintiff was not delusional does not mean he was not markedly impaired by his depression.

The second problem concerns a major theme in the ALJ decision, which is that the ALJ believed that plaintiff's reported daily activities negate evidence that he suffers the marked impairments found by his physicians. Plaintiff reported that he lived on his own, that he took care of his son when the son stayed with him, and that he could undertake some physical activities, such as snow shoveling, mowing the lawn, and playing basketball with his son. But these activities do not negate the symptoms and impairments found by Dr. Raster and plaintiff's other treating providers. Plaintiff's impairments are not primarily exertional, although he has some of those. His primary impairments are cognitive, psychological, and affective. The range of his daily activities, which are in fact fairly modest, does not negate the symptoms of his diagnosed major depression and that he suffers marked impairments as a result.

The ALJ similarly discounted the evidence from Ms. Gunville, the therapist:

> The undersigned also declines to give significant weight to Ms. Gunville's opinion as it is contrary to her actual progress notes in which the claimant's self-reports were clearly not indicative of the marked functional limitations that . . . Ms. Gunville reports.

R. 41. The ALJ does not cite anything specific in Ms. Gunville's progress notes. The Commissioner's brief contends that plaintiff was "steadily improving," Dkt. 21, at 7, based primarily on his GAF scores; 63 in the June 9, 2010 session, up from 60 for the previous three months, and from 53 at the start of the sessions in March. Ms. Gunville conducted six sessions with plaintiff, generally 50 minutes each, from March 1, 2010, to June 9, 2010. The court has reviewed these progress notes and finds nothing in them that is inconsistent with the marked limitations found by Ms. Gunville in her May 7, 2010, mental impairments questionnaire. The June 9th session notes "minimal improvement," but the session notes as a whole demonstrate that although plaintiff was making an effort with his treatment, he nevertheless suffered from major depression with serious symptoms. The modest improvement in his GAF scores, even if one of them reached the low end of the mild range, does not negate Ms. Gunville's assessment of plaintiff's symptoms.

The ALJ also rejected the opinion of Dr. Riordan, plaintiff's primary care physician, who had treated plaintiff since 2007. Dr. Riordan completed a RFC evaluation in December 2010, in which he opined that plaintiff was not "capable of performing sustained work activities in an ordinary work setting on a regular and continuing basis." R. 541. The ALJ rejected Dr. Riordan's opinions:

> The undersigned finds this opinion also is not supported by the objective medical findings in the record (e.g., Dr. Riordan's May, 2010 examination of the claimant) and is also inconsistent with the claimant's admitted activities of daily living. Claimant underwent physical examination by Dr. Riordan in May 2010, which was within normal limits. The undersigned further notes that the opinion of "disability" is reserve to the Commissioner and not a medical opinion. Thus, Dr. Riordan's opinion is not assigned significant weight.

R. 42. Plaintiff saw Dr. Riordan on May 7, 2010, for a follow-up for several conditions, including his diabetes, blood pressure, obesity, and trichotillomania. The records of that

11

examination, R. 518-21, do not indicate a patient "within normal limits," either physically or mentally. It is not at all clear to what "objective medical findings" the ALJ was referring in discrediting Dr. Riordan's opinion. In any case, plaintiff's primary impairments are not physical, and thus Dr. Riordan's appraisal of his physical condition in May, 2010, provides no basis to utterly discount his broader appraisal of plaintiff's impairments in December, 2010.

The ALJ also discounted the opinions of the non-examining state agency medical experts, who had opined that plaintiff suffered from moderate impairments, but could undertake unskilled, medium exertion work. R. 43. The opinions of state agency experts can be evidence supporting an ALJ's decision, *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447-48 (7th Cir. 2004), but in this case, the ALJ rejected those experts, too. The ALJ declined to give weight to those opinions because he concluded that plaintiff's medical history showed that he could not safely perform medium- or heavy-duty work. The court understands the ALJ's impulse to take a middle course between the treating providers and the non-examining state agency experts. But ultimately, the ALJ rejected essentially *all* the medical opinion in the case, instead relying on his own lay evaluation of plaintiff and his abilities. This approach circumvents the framework established by § 1527(c) and is grounds for remand.

**B. Plaintiff's credibility.**

The ALJ did not credit plaintiff's statements about the limiting effects of his impairments, for reasons that are not adequately explained and which the court finds lacking. In the decision, the ALJ provides only a limited explanation of his credibility determination:

> Upon considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the symptoms alleged. However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not found fully credible

> because they are not consistent with the objective evidence of record. The undersigned Administrative Law Judge finds that the claimant presented at the administrative hearing as a generally credible individual, with a bit of a stutter that did not limit his speech in any significant way. There was no evidence of diminished concentration, attention or memory present at the hearing, though the claimant complained he lacked focus and attention. He presented himself as a personable individual throughout the hearing, though he said that he does not like to be around people. The claimant did not present as significantly depressed/anxious at the hearing. He did exhibit a mild stutter and it appears that he is frustrated (reasonably) by his medical condition and inability to return to his past relevant work.

R. 42. Notwithstanding the ALJ's explanation, his credibility determination has three flaws.

First, the ALJ's credibility determination is contradictory. The ALJ found plaintiff was "a generally credible individual," and the ALJ acknowledged that the medical evidence of record—which in this case includes a brain aneurysm—could reasonably be expected to produce plaintiff's symptoms. If the medical evidence of record could have produced plaintiff's symptoms, and if plaintiff's testimony was generally credible, the ALJ would have to offer a particularly pointed critique of specific points in plaintiff's testimony. But the ALJ simply said that plaintiff's testimony about his limitations was "not consistent with the objective evidence of record." Without spelling out what evidence *actually contradicted* plaintiff's generally credible testimony, the court cannot evaluate whether the ALJ's conclusory statements are supported by substantial evidence.

Second, the ALJ placed undue emphasis on his lay appraisal of plaintiff's demeanor at the hearing. The ALJ's explanation of his credibility determination depends heavily on plaintiff's presentation at the hearing as personable and not depressed or anxious. All the medical experts—even the state agency examiners—acknowledged that plaintiff suffers from a major depressive disorder, yet the ALJ ignored these medical opinions and relied on his own impressions. "But judges, including administrative law judges of the Social Security

13

Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The ALJ had the opportunity to observe plaintiff only during a 50-minute hearing. Although the ALJ's impression of plaintiff is not immaterial, 50 minutes of lay observation cannot supersede a documented medical record of major depression and plaintiff's own testimony concerning the intensity of his symptoms.

Third, the ALJ unduly focused on plaintiff's daily activities. It is not clear whether, or to what extent, plaintiff's daily activities played a role in the ALJ's credibility determination. But those daily activities appear to have influenced nearly all aspects of the ALJ's decision. The court notes again that plaintiff's daily activities do not negate his testimony concerning the intensity of his depression or his ability to perform sustained work. The ability to manage household tasks, which are undertaken intermittently as needed, does not necessarily indicate an ability to sustain full-time work. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *see also Schmidt*, 914 F.2d at 118 (40 minutes of handball per week does not negate disabling heart disease). Together, these flaws leave the court unable to meaningfully review the ALJ's credibility determination and remand is appropriate.

**C. The ALJ's examination and of the vocational expert.**

The ALJ characterized Mr. Brodzinsky, the vocational expert, as having addressed "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." R. 44. But the ALJ's examination of Mr. Brodzinsky did not address the full range of plaintiff's limitations. Thus, Mr. Brodzinsky's testimony does not accurately indicate whether there are jobs in the economy for a person with plaintiff's limitations.

Mr. Brodzinsky testified that a person limited to unskilled work could not perform any of plaintiff's past relevant work. R. 78. The ALJ asked Mr. Brodzinsky a series of hypothetical questions involving a person with some of plaintiff's limitations. R. 79-83. The initial limitations posed by the ALJ were: unskilled work; only light physical exertion; no more complex than one or two steps; no working at heights, near dangerous machinery, or in hazardous environments; no climbing of ladders, ropes or scaffolds; no piece rate work; no frequent interaction with the public; and no constant interaction with co-workers. Mr. Brodzinsky opined that such a limited worker could be a housekeeping cleaner or a small parts assembler, and that there were significant numbers of such positions in the Milwaukee area. But plaintiff has additional limitations, so this hypothetical cannot be the end of the story.

The ALJ added a further limitation, based apparently on Dr. Riordan's appraisal of plaintiff's physical limitations, *see* R. 538-39, which the ALJ apparently credited. The ALJ asked:

> Let me further add to this hypothetical situation the maximum continuous sitting, standing or walking of one hour, at which time the worker will require a one to two-minute period of position change. Let me add to that, total walking and standing for the day four hours.

R. 81. Mr. Brodzinsky's answer was equivocal. He testified that, based on his experience, the position of small parts assembler would allow a "sit/stand" option, but that it was "pretty much continuous work" that would not allow frequent breaks. R. 81-82. Mr. Brodzinsky's testimony does not establish that a person with plaintiff's physical limitations could work as either a small parts assembler or a housekeeper/cleaner.

Finally, the ALJ added a further limitation as reflected in the report from Dr. Raster, plaintiff's treating psychiatrist:

> If we added to our hypothetical that the individual was markedly limited in [his] ability to maintain attention and concentration for extended periods, sustain an ordinary work routine without special

15

>supervision and perform activities within a schedule and maintain regular attendance. Do those limitations sound like they're consistent with competitive employment to you?

R. 82-83. Mr. Brodzinsky's answer was that any of those limitations alone would preclude employment. Mr. Brodzinsky's answer to this question did not influence the ALJ's decision, however, because the ALJ discounted Dr. Raster's opinion. But if Dr. Raster's opinion is credited, and it should be per the discussion above, then Mr. Brodzinsky's testimony on this point cannot be disregarded.

Even apart from Dr. Raster's opinion, the ALJ apparently accepted that plaintiff has at least moderate restrictions in the activities of daily living, in social functioning, and with concentration, persistence and pace. R. 38. On remand, the ALJ should make clear how these limitations are reflected in plaintiff's RFC. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Then, each of plaintiff's limitations should be addressed by the vocational expert, if that testimony is to be helpful. *See O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619-20 (7th Cir. 2010). On remand, the ALJ should ensure that each of plaintiff's limitations—established by the evidence as properly considered—is addressed in any vocational expert testimony.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Clifton R. Evans's application for disability benefits is

REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

  Entered this 12th day of June, 2014.

          BY THE COURT:

          /s/

          _____
          JAMES D. PETERSON
          District Judge